HERRING, Judge,
for the Court:
¶ 1. Sunbeam/Oster Company, Inc. and its carrier, Insurance Company of the State of Pennsylvania (hereafter referred to either individually or collectively as Sunbeam), appeals from a decision of the Circuit Court of Marshall County, Mississippi, which affirmed the decision of the Mississippi Workers’ Compensation Commission (hereafter Commission). The Commission granted benefits for total and permanent disability as a result of an injury sustained in the workplace by Helen Bolden. The Commission based the decision upon its determination that Bolden was permanently and totally disabled pursuant to Miss.Code Ann. § 71-3-17(a) (Rev. 1995) and overruled the order of the administrative law judge, who awarded benefits based upon a finding that Bolden was permanently partially disabled pursuant to Miss. Code Ann. § 73-3-17(25) (Rev.1995). We affirm.
I. FACTS
¶ 2. This matter was heard before an administrative law judge on July 12, 1995, at 1:00 p.m. at the Marshall County Courthouse located in Holly Springs, Mississippi. After hearing and reviewing the evidence, the administrative law judge, on October 30, 1995, ordered the employer/carrier to pay benefits as follows:
1. Temporary total disability benefits in the amount of $227.18 per week commencing on October 25, 1993 through January 18,1995, with proper credit to be given for any benefits, monies or wages previously paid to the claimant;
2. Permanent partial disability benefits in the amount of $104.80 per week commencing on January 19, 1995 and continuing for the statutory maximum of 450 weeks pur *715 suant to Mississippi Code Annotated, Section 71-3-17(25) (1972);
3. Penalties and interest, if applicable, pursuant to Mississippi Code Annotated, Section 71-3-37(5) (1972);
4. Provide medical services and benefits as required by the nature of the claimant’s injury and the process of her recovery therefrom pursuant to Mississippi Code Annotated, Section 71-3-15 (1972).
¶ 3. Sunbeam appealed this decision to the Mississippi Workers’ Compensation Commission which heard the matter on September 30, 1996. On December 3, 1996, the Commission entered its order stating:
The Order of Administrative Judge dated October 30, 1995 is reversed accordingly, and the Employer and Carrier are hereby ordered to pay unto Bolden compensation for permanent total disability in the amount of $183.21[1] per week for a period of 450 weeks, commencing on October 25, 1993. The Employer/Carrier may take credit for any disability benefits previously paid. Moreover, the Employer/Carrier are liable for penalties and interest, as provided by law, on any installments of compensation not timely paid.
Finally, the Employer/Carrier are also obligated to provide Bolden with whatever medical treatment and supplies which are required by the nature of her injury and the process of her recovery, subject to the requirements of Miss.Code Ann. § 71-3-15 (Rev.1995) and the Mississippi Workers’ Compensation Medical Fee Schedule.
¶ 4. Sunbeam timely filed its notice of appeal to the Circuit Court of Marshall County, Mississippi. The circuit court affirmed the Commission’s decision and Sunbeam appealed to this Court.
¶ 5. At the hearing, Helen Bolden testified that she was born on January 3, 1937, in Marshall County, Mississippi; that she attended public school in Slayden, Mississippi; and that she completed the eighth grade. She received no additional education, although at the time of the hearing before the administrative law judge, she was attending classes to obtain her G.E.D. Prior to 1983, Bolden was busy raising and earing for her children. In 1983 and 1984, she worked as a waitress but left that employment to go to work for Sunbeam in 1985. She worked for Sunbeam at its plant in Holly Springs until the plant closed in 1995. While working at Sunbeam, Bolden held various assembly line positions. She worked on the “hotshot line,” the “fry pan line,” the “toaster line,” operated a press which made labels, and packaged various products assembled at Sunbeam. On October 25,1993, at approximately 1:20 p.m., Bolden was working in the course and scope of her employment at Sunbeam when she fell over a platform and fractured her wrist.
¶ 6. Bolden was treated for her injury by Dr. Monaghan who saw her several times and then referred her to Dr. Calandruecio, an orthopaedic surgeon in Southaven, Mississippi, who first saw Bolden on November 3, 1993. Two days later on November 5, 1993, Dr. Calandruecio performed surgery on Bol-den’s wrist. The nature of Bolden’s injury required a realignment of the bones, as well as the use of pins and an external fixator to maintain proper bone alignment. On December 10, 1993, the pins were removed and the external fixator was removed on December 22,1993. Dr. Calandruecio released Bol-den to return to work on March 17, 1994, with the restriction that she wear a wrist splint and that she be placed on a zero to ten pound weight limit during the course of her duties.
¶ 7. Dr. Calandruecio next saw Bolden on April 27, 1994. On this occasion, Bolden complained that she was having trouble picking up screws, lifting heavy objects, and was experiencing pain. Dr. Calandruecio’s examination showed limited wrist motion, as well as limited forearm rotation, and x-rays demonstrated degenerative changes at her wrist level. Dr. Calandruecio released her to return to work, and Bolden continued to wear her splint while on the job. He next saw her on June 22, 1994. At that time, Bolden was *716 continuing to have problems doing assembly line work with products which weighed approximately three pounds. According to the record, she had problems with fine manipulation, she was tender in her wrist area, and she had marked limitation when she attempted to make a fist. Dr. Calandruccio gave her an injection at the base of the thumb and scheduled her for electrical studies. She was again released for light duty.
¶ 8. On June 27, 1994, Bolden underwent a second surgery which included treatment for carpal tunnel syndrome. Dr. Calandruccio testified that the inability to do fine manipulation or to pick up small objects, was a “critical manifestation of this particular problem,” (carpal tunnel syndrome) and that the carpal tunnel syndrome was a result of the injury she sustained at Sunbeam. Thereafter Dr. Calandruccio saw Bolden on July 20, 1994, August 17, 1994, and September 7, 1994. On September 7,1994, Dr. Calandruc-cio noted that Bolden was still complaining of pain in her right upper extremity, and he placed her in a padded glove because of tenderness. He also noted that Bolden complained of pain in her left knee but he did not relate that pain to Bolden’s injury at Sunbeam accident.
¶ 9. On September 11, 1994, Bolden returned to work at Sunbeam, and Dr. Calan-druccio continued to treat Bolden until her release on January 18, 1995. She continued to work at Sunbeam until February, 1995, when she accepted a voluntarily layoff after Sunbeam decided to relocate its plant facilities to Hattiesburg..
¶ 10. According to Dr. Calandruccio, Bol-den reached maximum medical improvement on January 18, 1995, and she was released from further treatment. Dr. Calandruccio testified that on January 18, 1995, Bolden still had problems making a full fist, had pain at the base of her thumb and the back of her wrist, and had a limited motion. Although her sensation was normal, her grip strength was fifteen pounds in her right hand and thirty pounds in her left hand. Significantly, Bolden had a dominant right hand. Dr. Ca-landruccio testified, “I would add that a right hand dominant person should be slightly greater in that hand than the non-dominant hand perhaps 40 rather than 15 here.” He also stated that a potential for additional surgery existed in the future. Regarding Bolden’s impairment rating, Dr. Calandruccio stated:
[0]n 02-01-95 I arrived at an impairment rating of 38 percent of the upper extremity which was based on restriction of wrist, forearm and finger motion.... [S]he may in the future require a wrist fusion an operative procedure which would eliminate wrist motion, still give forearm rotation, just eliminate wrist motion and anticipated that the medical fees Campbell Clinic fees, hospital fees and all necessary follow up would be in the neighborhood of $5,000.
Moreover, Bolden’s last set of work restrictions “were permanent restrictions in which [there] were limitations on the right upper extremity at a zero to ten pound weight limit and restrictions on pushing, pulling, grasping, repetitive, movements, twisting activities. She probably will require a wrist splint occasionally at work and her condition really had been unchanged for the previous three months.” When Dr. Calandruccio was asked the question, “based upon a reasonable degree of medical probability do you have an opinion about whether she could return to work if the job fit within those restrictions?”, his answer was “Yes.”
¶ 11. In February, 1995, Sunbeam began to phase out its operations in Holly Springs and prepared to move its operations to Hatties-burg, Mississippi. As orders for a particular product were completed, Sunbeam closed down the idled line, and employees, including Bolden, were given the opportunity to move to other lines still in service. However, Bol-den testified that when her line shut down, she approached the personnel manager about work on another line, but the personnel manager told her “that they didn’t think I could do the jobs because it pertained to screwdrivers and items like that, and he said he thought it would further hurt my hand.... ” Bolden could not remember the name of the specific personnel manager that she spoke with, but Sunbeam did not rebut or challenge this testimony. Thus, she accepted a voluntary layoff as a result of her conversation with the personnel manager.
*717 ¶ 12. Bolden has not worked since taking her voluntary layoff, and she filed for state unemployment benefits and also for social security benefits. Her social security benefits were approved and were scheduled to start in September, 1996. According to her testimony, she sought employment at various companies in Holly Springs and either placed applications or inquired about positions at ITT Thompson, Mulay Plastics, Maurey Manufacturing Company, American Plastic Toy, B and B Concrete, Big Dave’s Quick Stop, Piggly Wiggly, Wenco Company, Miller’s Department Store, Tyson’s Drug Store, Dowdle Gas Company, Hardee’s, Pizza Hut, and McDonald’s. She testified that Sunbeam’s vocational expert, David Stewart, took her to a Hardee’s Restaurant, a Pizza Hut Restaurant, and a McDonald’s Restaurant in an effort to assist her in obtaining employment, but that these efforts were unsuccessful.
¶ 13. Bolden testified that she was restricted in her job search to those companies or businesses located in Marshall County, Mississippi, because she did not own or have access to an automobile and therefore lacked transportation. The last vehicle owned by Bolden was “totaled out” by her son-in-law, and she never purchased another. During the last three years that she worked at Sunbeam, she rode to work with friends. She further testified that she did not intend to go back to driving a vehicle because she had 'a problem determining distances between her vehicle and those around her, and because driving made her nervous. Finally, she testified that she would take a job outside Marshall County if transportation could be arranged.
¶ 14. From the time she returned to work in September, 1994, until the plant closed in February, 1995, Bolden worked forty hours a week. Her rate of pay at the time of the accident was $6.85 per hour, and she was making $7.11 per hour when she took her voluntary lay off. The raise in pay was the result of a general raise to all employees at the Sunbeam plant and not the result of any increased productivity.
¶ 15. Sunbeam, with leave of the administrative law judge, called several witnesses out of order. Betty Bradford, an employee at Maurey Manufacturing, testified that Maurey accepted applications year around and that Bolden’s application had been accepted and placed with all of the other applications-. Tanya Conway, a secretary with Wenco, testified that Wenco had a sign on the door that said “Not accepting applications.” She testified that on the dates Bol-den testified that she came to apply for employment, Wenco was not accepting applications. Conway did not know or remember Bolden. Jennifer Irvin with ITT Thompson testified that her company hired its employees through the Hernando Job Service and that she signed Bolden’s application stating that ITT Thompson was not hiring at the time. The parties stipulated that Jessie Isom of Piggly Wiggly would have testified that Bolden talked to him about a job but that Piggly Wiggly was not hiring at that time.
¶ 16. Lamar Crocker, Bolden’s vocational expert, testified that he had reviewed Dr. Calandruccio’s reports, deposition, billing statements, office notes regarding treatment, and diagrams regarding the jobs performed at the Sunbeam plant. He also interviewed with Bolden. Crocker testified that the tests which he administered to Bolden revealed that she had a Intelligence Quotient (I.Q.) of 83; her reading was on eighth grade level; her spelling was on twelfth grade level; and her arithmetic performance was on a sixth grade level. Crocker performed a labor market. survey which indicated that Bolden was one hundred percent disabled and that no jobs were available for Bolden in Marshall County, DeSoto County, or Lafayette County. He further estimated that Bolden’s loss of wage earning capacity was between $125,-000 and $135,000. He stated that pursuant to the Dictionary of Occupational Titles (DOT), Bolden was not qualified for any job with a rating higher than a two, sedentary work. Crocker explained sedentary work from an exertion stand point. He stated that “exertionally, it’s lifting up to ten pounds of weight occasionally and/or negligible amount of weight frequently....” Crocker further noted that occasional, as defined by the Department of Labor, is exertional effort up to *718 one-third of a day (2.5 hours). Frequent work factors are two-thirds of a day or five hours. In Crocker’s opinion, Bolden, as a result of her injury, was totally lost to the labor force.
¶ 17. Sunbeam called Darsie Belle Ivy, a registered nurse at Quartet Manufacturing Company in Ashland, Mississippi, as a witness. Ivy testified that she supervised safety and nursing at Quartet and that she was previously employed at Sunbeam in assembly and production while Bolden was working there. She testified that upon Bolden’s return to Sunbeam after her second operation, Bolden was placed back on the assembly line placing labels on the product boxes. Ivy testified that Bolden had trouble with the labels, and she caught another employee peeling the labels for Bolden because Bolden could not perform the task with her right hand. Ivy testified that Bolden was placed on the blender line where she was required to test blenders, and Sunbeam was required to replace Bolden’s right-handed electrical plug with a left-handed plug so that Bolden could perform her job with her left hand. At one point, Bolden performed cleaning duties in the Sunbeam restrooms in order to stay on the payroll.
¶ 18. Ivy testified that when the lines began to close down, Sunbeam employees were given the opportunity to move to other lines or to take their voluntary leave. Ivy testified that Bolden was in a position to transfer to another line but to her knowledge chose not to transfer. She stated that if Bolden had desired to transfer to another line, the request to do so would have come to her. Ivy testified that she thought Bolden could work at Quartet although she did not know if a job was open or if Quartet would hire Bolden.
¶ 19. Sunbeam then called David Stewart who was tendered and accepted as a vocational expert. Stewart testified that he met with Bolden at her attorney’s office on May 16, 1995, and inspected all of her medical records from the Campbell Clinic, including Dr. Calandruccio’s reports. He then interviewed Bolden. From the information he received, Stewart stated that Bolden was a semi-skilled factory worker and waitress with an eighth grade education. At Sunbeam, she had been a small products assembler and packager and quality control tester. He testified that he was asked to help her find employment.
¶ 20. Stewart testified that he found jobs which Bolden was capable of performing which included: Styleeraft in Hernando, Mississippi, Emerson Electric in Oxford, Mississippi, American Plastic Toy, Marietta Soap, P.S.I., Roche Biomedical, Guardsmark Security, Oxford Answer Phone, Hardee’s, McDonald’s, and Pizza Hut. Only Hardee’s, McDonald’s, and Pizza Hut were located in Holly Springs and all other employment opportunities were located outside of Holly Springs and Marshall County. Stewart accompanied Bolden to Hardee’s, McDonald’s, and Pizza Hut interviews. All three companies stated that they were not hiring additional personnel at the time. As stated, all other companies which Stewart contended had openings for which Bolden was qualified were located outside of Marshall County. In addition, those jobs required that Bolden perform tasks which were beyond her established capabilities, and Stewart admitted on cross-examination that if one strictly construed the Dictionary of Occupational Titles, no jobs were available for Bolden. Stewart’s assistance to Bolden in her job search came at the request of Bolden’s attorney.
¶ 21. Bolden also saw Dr. Anthony Segal, a neurosurgeon, in Memphis Tennessee. Dr. Segal’s written report indicated that on April 13, 1995, he reviewed the medical reports and records sent to him and that he interviewed and examined Bolden on that occasion. His report indicates that Bolden no longer had any residual effects of carpal tunnel syndrome and that Bolden’s “main problem is pain in the wrist every day, even at rest. It is made worse with activity, and the pain is in the lateral side of the wrist on the anterior surface. Her strength is worse than it was before the injury, her grip is weak. She still lacked some closing of the fist, and the range of movement is restricted, particularly in extension.” Dr. Segal would not give an impairment rating although he recognized that Bolden had an “impairment rating secondary to the pain and loss of movement of her wrist, but I never give *719 ratings because I am not an orthopedic sur-geon_ Overall, I agree with Dr. Calan-druecio.”
II. ISSUES
¶ 22. Sunbeam asserts two assignments of error which are taken verbatim from its brief as follows:
A. WHETHER THE MISSISSIPPI WORKER’S COMPENSATION COMMISSION WAS CORRECT IN DETERMINING THAT THE CLAIMANT WAS PERMANENTLY AND TOTALLY DISABLED.
B. WHETHER THE MISSISSIPPI WORKER’S COMPENSATION COMMISSION, IN ITS DETERMINATION THAT THE CLAIMANT WAS PERMANENTLY AND TOTALLY DISABLED, MISAPPREHENDED THE CONTROLLING LEGAL PRINCIPLES REQUIRED IN MAKING SUCH A DETERMINATION.
III. ANALYSIS
¶23. The standard of review utilized by this Court when considering an appeal of a decision of the Mississippi Workers’ Compensation Commission is well settled. The Mississippi Supreme Court has stated that “[t]he findings and order of the Workers’ Compensation Commission are binding on the court so long as they are ‘supported by substantial evidence.’” Vance v. Twin River Homes, Inc., 641 So.2d 1176, 1180 (Miss.1994) (quoting Fought v. Stuart C. Irby Co., 523 So.2d 314, 317 (Miss.1988)). An appellate court is bound even though the evidence would convince that court otherwise if it were instead the ultimate fact finder. Barnes v. Jones Lumber Co., 637 So.2d 867, 869 (Miss.1994). Therefore, this Court will not overturn a Commission decision unless it finds that the Commission’s decision was arbitrary and capricious. Id. See also Walker Mfg. Co. v. Cantrell, 577 So.2d 1243, 1247 (Miss.1991). In Walker Manufacturing our supreme court stated:
In a very real sense, all of this is nothing other than a workers’ compensation variant on accepted limitations upon the scope on judicial review of administrative agency decisions, i.e., that the courts may interfere only where the agency action is seen arbitrary or capricious. Arbitrariness and caprice are in substantial part a function of the presence vel non of credible evidence supporting the agency decision. Where we find such evidence, we have no more authority to interfere with the decisions of the Commission than we do in a case of any other administrative body.
That we may have found the fact otherwise, had we been the triers of fact, is similarly of no moment, so long as the record contains credible evidence which, if believed, would take the Commission’s decision out of the realm of the arbitrary.
Id. (citations omitted). Thus our inquiry into the matter sub judice is limited to a review of the record to determine if the record contains credible evidence which supports the Commission’s decision to grant permanent total disability benefits to Bolden. Upon finding such evidence, this Court will have no alternative but to affirm the Commission’s order unless we find that the Commission’s ruling was based upon an erroneous legal principle.
DISABILITY
¶24. Mississippi Code Annotated Section 71-3-3Q) (Rev.1995) states:
“Disability” means incapacity to earn wages which the employee was receiving at the time of the injury in the same or other employment, which incapacity and the extent thereof must be supported by medical findings.
See Jordan v. Hercules, Inc., 600 So.2d 179, 183 (Miss.1992); Thompson v. Wells-Lamont Corp., 362 So.2d 638, 640 (Miss.1978).
¶ 25. The degree of disability suffered by an employee under our workers’ compensation law is determined by (1) the actual physical injury and (2) the loss of wage earning capacity. Spann v. Wal-Mart Stores, Inc., 700 So.2d 308, 312-13 (Miss.1997) (citing General Elec. Co. v. McKinnon, 507 So.2d 363, 365 (Miss.1987)); Bill Williams Feed Serv. v. Mangum, 183 So.2d 917 (Miss.1966). Neither side in this ease- disputes that Bol- *720 den’s injury occurred while she was acting in the course and scope of her employment, and there is no dispute that Bolden had a permanent impairment to her right upper extremity of thirty-eight percent (based upon restrictions of the wrist, forearm, and finger motion) as a result of that injury. Thus, one of the remaining issues is whether, as a result of her injury, Bolden has suffered a loss of wage earning capacity which is both permanent and total in nature.
A. WAS THE MISSISSIPPI WORKERS’ COMPENSATION COMMISSION CORRECT IN DETERMINING THAT THE CLAIMANT WAS PERMANENTLY AND TOTALLY DISABLED?
¶26. Sunbeam challenges the Commission’s finding of fact that Bolden sustained a total loss of wage earning capacity and correctly points out that the Commission’s order contains an erroneous finding of fact. We agree that the Commission’s order contains an erroneous finding of fact which states: “Importantly, Bolden had attempted to return to her job at Sunbeam before its closure, but she was physically unable to perform this work.”
¶27. However, as noted above and elsewhere in this opinion, the Commission’s decision to award compensation for a disability is predicated upon the evidence presented as a whole. Piggly Wiggly v. Houston, 464 So.2d 510, 512 (Miss.1985); McGowan v. Orleans Furniture, Inc., 586 So.2d 163, 167 (Miss.1991). This Court’s ability to review a Commission’s decision is restricted to a determination of whether the Commission’s findings of facts and order are supported by substantial evidence, even though we as finder of fact would have been convinced otherwise. Spann v. Wal-Mart Stores, Inc., 700 So.2d 308, 311 (Miss.1997) (citing Fought v. Stuart C. Irby Co., 523 So.2d 314, 317 (Miss.1988)). We rule that the facts and the testimony presented in the case sub judice, when taken as a whole, support the Commission’s conclusion that Bolden is permanently and totally disabled.
¶28. Sunbeam incorrectly contends that Bolden worked for eleven continuous months prior to taking her voluntary layoff and therefore was not totally disabled. To accept this assertion, we would have to disregard the fact that Bolden had to endure a second surgery to manipulate her wrist and was required to undergo a carpal tunnel release procedure. Moreover, we would be required to believe that Bolden required no recovery period after her surgery and immediately returned to work. This was not the ease. In fact, her recovery period lasted from the date of surgery, June 27, 1994, until September 11,1994.

The best evidence of employee’s ability to perform the work is her actual performance on the job.

¶ 29. A rebuttable presumption is raised that the claimant has suffered no loss of wage earning capacity when an employee returns to her same job, performing the same duties and receiving the same pay, or greater pay, as she received prior to her injury. In Spann v. Wal-Mart Stores, Inc., 700 So.2d 308, 313 (Miss.1997), our supreme court stated:
The statute has been construed by this Court to mean that post-injury earnings equal to or in excess of pre-injury earnings are strong evidence of non-impairment of earning capacity, but that the presumption arising therefrom may be rebutted by evidence on the part of the claimant that the post-injury earnings are unreliable due to: increase in general wage levels since the time of the accident, claimants own greater maturity and training, longer hours worked by the claimant after the accident, payment of wages disproportionate to capacity out of sympathy to claimant, and the temporary and unpredictable characteristics of post injury earning. (Citations omitted) General Electric Co., 507 So.2d at 365, citing Wilcher v. D.D. Ballard Construction Co., 187 So.2d 308, 310-11 (Miss.1966) (string citation omitted) (emphasis in the original).
Moreover, this list is certainly not an exclusive. (citations omitted) Our recent decision in Hall of Mississippi, Inc. v. Green, 467 So.2d 935 (Miss.1985), reflects that any factor or condition which causes the actual post-injury wages to become a less reliable *721 indicator of earning capacity will be considered.
Further, our supreme court has stated:
Factors which this court has considered in determining loss of wage earning capacity include the amount of education and training which the claimant has had, his inability to work, his failure to be hired elsewhere, the continuance of pain, and any other related circumstances. Malone & Hyde of Tupelo, 250 Miss. at 882, 168 So.2d at 527. In other words, the determination should be made only after considering the evidence as a whole. Piggly Wiggly, 464 So.2d [at] 512.
McGowan v. Orleans Furniture, Inc., 586 So.2d 163, 167 (Miss.1991). Thus, the determination of the extent of Bolden’s disability should be made only after considering the evidence as a whole considering any factor relevant to the issue of the loss of wage earning capacity.
¶ 30. The testimony given at the administrative law judge’s hearing is that Bolden was injured on October 25, 1993, and was temporarily totally disabled from October 25, 1993, through or to March 21, 1994. There was a period from April 14, 1994, through April 17,1994, in which she received benefits. She also received benefits from June 27, 1994, through September 11, 1994. She reached maximum medical improvement on January 18, 1995. Bolden worked at Sunbeam from September 11, 1994, until she took voluntary layoff in February, 1995. Bolden made $6.89 per hour before and after her injury. In February, 1995, she and other employees similarly situated received a raise in pay to $7.11 per hour. Thus, this pay raise was not a raise that was based upon Bolden’s personal performance.
¶ 31. Although she returned to work on September 11, 1994, Bolden stated that she worked in constant pain. This testimony was corroborated by Dr. Calandruccio and Dr. Segal. Dr. Segal’s report stated that as of April 13, 1995, Bolden’s “main problem is pain in the wrist every day, even at rest.” Bolden’s testimony as to her problems performing her work duties were further bolstered by the testimony of Darsie Bell Ivy.
¶32. Darsie Bell Ivy, a former Sunbeam employee, testified that Sunbeam was aware that Bolden was having problems with her hand and tried to accommodate Bolden’s inability to use her right hand. Ivy testified that when Bolden came back to work, she was required to place labels on the product boxes. As stated, Ivy testified that she caught another employee assisting Bolden by reaching down into the label box and getting the labels for Bolden. This was because Bolden could not get the labels herself. From that point on, Bolden was encouraged to use only her left hand at work.
¶33. Bolden and Sunbeam presented expert testimony regarding Bolden’s ability to perform work. Crocker, Bolden’s expert, testified that Bolden was one hundred percent occupationally disabled as a result of her injuries. David Stewart, Sunbeam’s expert, testified that it was his opinion that Bolden could get employment if she went outside of Marshall County. However, Stewart did unsuccessfully attempt to assist Bolden in finding employment at three fast food restaurants in Holly Springs. All attempts to find work or prospects of employment were unsuccessful.
¶ 34. Based upon all of the foregoing facts and case law, we cannot say that the record did not contain substantial evidence to support the Commission’s decision that Bolden’s injury resulted in a total loss of wage earning capacity leaving her permanently and totally disabled. In fine, we cannot say that the Commission’s decision in this regard was unreasonable, arbitrary or capricious.

Did the employee’s self-imposed limitation on driving out of the county constitute a less than reasonable effort to obtain alternate employment?

¶ 35. Barnes v. Jones Lumber Company, 637 So.2d 867, 870 (Miss.1994) set out some of the requirements for establishing a disability, stating:
To establish disability, the injured worker bears the burden of showing that he has sought and been unable to obtain work “in similar or other jobs”. Georgia Pacific v. Taplin, 586 So.2d 823, 828 (Miss.1991). Once he has made a prima facie case, the burden shifts to the employer to show that *722 his efforts were not reasonable or constituted a mere sham. Id.; Pontotoc Wire Products Co. v. Ferguson, 384 So.2d 601, 603 (Miss.1980). A determination of the “reasonableness” of the claimant’s efforts includes “consideration of job availability and economics in the community, the claimants skills and background, as well as the subject disability itself.” Taplin, 586 So.2d at 828; Piper Industries, Inc. v. Herod, 560 So.2d 732, 735 (Miss.1990). Dunn further explains:
In resolving the issue in relation to seeking and finding other employment, several factors may be relevant. These include the economic and industrial aspects of the local community; the jobs available in the community and the surrounding area; the claimant’s general educational background, including work skills, and the particular nature of the disability for which compensation is sought. Dunn, Mississippi Workmen’s Compensation, § 72.1 (3d ed.1982).
¶ 36. The testimony presented at the hearing indicates that Bolden attempted to obtain employment at numerous places in Holly Springs and in Marshall County. Her job search included the Unemployment Services Offices in Oxford, Mississippi, at ITT Thompson, Mulay Plastics, Maurey Manufacturing Company, American Plastic Toy, B and B Concrete, Big Dave’s Quick Stop, Piggly Wiggly, Wenco Company, Miller’s Department Store, Tyson’s Drug Store, Dowdle Gas Company, Hardee’s, Pizza Hut, and McDonald’s. Bolden testified that Sunbeam’s vocational expert, David Stewart, took her to Hardee’s, Pizza Hut, and McDonald’s in an effort to assist her in obtaining employment. These efforts resulted in no job offers.
¶ 37. Bolden refused to go outside of Marshall County in search of employment because she did not feel comfortable driving. She had not owned an automobile since her son-in-law totaled her vehicle some years before. She testified that she could no longer judge the distance between her vehicle and other vehicles and that this condition made her nervous. As stated, Bolden testified that she had no plans to purchase another motor vehicle. However, she did testify that she would go to work outside of Marshall County if she could arrange transportation, and the job was one that she could perform given her restrictions.
¶ 38. Based upon the foregoing facts and testimony, there is ample evidence in the record to support the Commission’s determination that Bolden had made reasonable efforts to secure alternate employment, even though she did not go beyond Marshall County, Mississippi, in her search for a job.
B. DID THE COMMISSION APPLY AN ERRONEOUS LEGAL PRINCIPLE WHEN IT APPLIED THE SMITH RULE TO THIS CASE?
¶ 39. The Workers’ Compensation Act concerns occupational and industrial disabilities, not medical or functional disabilities. Smith v. Jackson Constr. Co., 607 So.2d 1119, 1125 (Miss.1992). However, this has not been the case for the loss of a “scheduled member” as defined and enumerated in Mississippi Code Annotated Section 71-3-17(c) (Rev.1995) that yields only a permanent partial disability. Id. In such a case, the loss of a scheduled member, such as the loss of an arm, results in at least permanent partial disability only for which an employee may be compensated. However, our Mississippi Supreme Court also stated in Smith as follows:
[W]e hold foursquare that Section 71-3-17(a) covers all cases of permanent total occupational disability, to the exclusion of Section 71-3-17(c) which by its title and its terms covers only permanent partial occupational disability (although it may be permanent, total loss of use of a specific member). Where an employee suffers an injury covered by the schedule in Section 71-3-17(c) and where that injury results in a permanent loss of wage earning capacity within Section 71-3-17(a), the latter section controls exclusively and the employee is not limited to the number of weeks of compensation prescribed in Section 71-3-17(c)’s schedule.
Id. at 1128 (emphasis added). The rule in Smith only applies to claims where an injury to a scheduled member, pursuant to Section 71-3-17(e), results in a permanent loss of wage earning capacity. This is precisely the type of injury and resulting disability suf *723 fered by Bolden. We rule that the Commission did not misapply the legal principles of Smith in the case subjudice.
¶ 40. The application of Smith is reserved for those claimants who qualify pursuant to the facts of the case. Moreover, the order of the Commission will not be disturbed unless that order is unreasonable, arbitrary, or capricious. Arbitrariness and caprice are in substantial part a function of the presence vel non of credible evidence supporting the agency decision. Where we find such evidence, we have no more authority to interfere with the decision of the Commission than we do in a case of any other administrative body. Walker Mfg. Co. v. Cantrell, 511 So.2d 1243, 1247 (Miss.1991).
¶41. The Commission found that Bolden continues to have pain when using her right arm and hand, and that she has been unable to secure any gainful employment despite wholly reasonable efforts to do so. She has a very limited education, and she has little if any transferrable work skills or training other than as an assembly line worker. Having reviewed the record, this Court cannot say that the Commission’s decision is arbitrary or capricious or that the circuit court abused its discretion when it affirmed the Commission’s order. For all of the foregoing reasons, we affirm.
¶ 42. THE JUDGMENT OF THE MARSHALL COUNTY CIRCUIT COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE TAXED TO THE APPELLANTS.
BRIDGES, C.J., McMILLIN and THOMAS, P.JJ., and COLEMAN, DIAZ, HINKEBEIN, KING, PAYNE and SOUTHWICK, JJ., concur.

. The Commission noted that the administrative law judge's order inadvertently provided that Bolden's disability compensation rate was $227.18 per week, but based on the uncontested average weekly wage of $274.80, benefits for total disability are payable at the rate of $183.21 per week.